IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MAXIE D. REEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:08cv655-CSC |
| | ) | (WO) |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  Introduction

The plaintiff challenges the Commissioner's denial of disability and supplemental

security income benefits for the closed period from April 8, 1995 to February 1, 1999.  A

brief recitation of the procedural history of the case is necessary to understand the court's

resolution of this matter.

On March 26, 1999, the plaintiff, Maxie D. Reeves ("Reeves"), applied for disability

insurance benefits pursuant to Title II of the Social Security Act,  42 U.S.C. §§ 401 et seq.,

and for supplemental security income benefits under Title XVI of the Social Security Act,

42 U.S.C. § 1381 et seq., alleging that he was unable to work because of a disability.  His

application was denied at the initial administrative level.  Reeves then requested and received

a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ

concluded that the plaintiff has severe impairments of "lumbar radiculitis; sciatica; status

post alcohol abuse; status post polysubstance drug abuse; and recurrent major depression."

(R. 19).  According to the ALJ, Reeves could not return to his past relevant work as a welder, iron worker or kitchen worker.  On December 21, 2000, the ALJ issued a partially favorable decision in which the ALJ determined that Reeves was disabled since February 1, 1999 but not prior to that date.  (R. 16).  "Since February 1, 1999, the evidence demonstrates that the claimant has been drug and alcohol free; however, the evidence further demonstrates that since that time, the claimant has had a severe impairment at Listing level."  (R. 23).

Reeves appealed the ALJ's decision to the Appeals Council, requesting that the Appeals Council review the ALJ's decision.  The Appeals Council rejected the request for reconsideration.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Reeves then appealed the Commissioner's partial denial to this court.

On September 15, 2003, on the motion of the Commissioner, the court remanded the case pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to allow the ALJ to

> update the medical records from all treating sources and obtain consultative examinations, as needed.  In addition, a supplemental hearing will be conducted which will include additional testimony from Plaintiff, testimony from a medical expert with a speciality in mental disorders, and additional testimony from a vocational expert which will be based on a hypothetical which includes all of the limitations established by the record.  The ALJ will issue a new decision for the period at issue, which reevaluates the severity of each of the impairments established in the record, including diabetes and

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

> depression and, if pertinent, determine the issues of drug and alcohol addiction
> (DA & A) under the process outlined in 20 C.F.R. § 404.1535 and § 416.935.

(R. 750 & 755).

On June 12, 2004, on the first remand, the Appeals Council affirmed the ALJ's finding that Reeves was disabled since February 1, 1999 but vacated the decision as it applied to the time period before February 1, 1999.[2]   (R. 746).   The Appeals Council remanded the matter to the ALJ for further proceedings to consider whether Reeves suffers from a mental impairment; to properly evaluate the severity of his diabetes mellitus and his subjective complaints; and to properly assess his residual functional capacity.   (R. 747). After a hearing on April 26, 2005,  the ALJ concluded that Reeves had severe impairments of "lumbar radiculitis; sciatica; status post alcohol abuse; status post polysubstance drug abuse; and recurrent major depression."  (R. 738).   The ALJ further concluded that Reeves could not perform his past relevant work as welder,  iron worker, or kitchen worker.  (R. 741).   Nonetheless, the ALJ concluded that Reeves was not disabled because he "had the residual functional capacity to perform jobs existing in significant numbers in the national economy."  (*Id.*).

The plaintiff appealed the ALJ's decision to the Appeals Council, requesting the Appeals Council again review the ALJ's decision.  The Appeals Council rejected the request for reconsideration,  and  the  ALJ's  decision  again  became  the  final  decision  of  the Commissioner.  Reeves then appealed the Commissioner's denial of benefits for the period

---

[2]  Reeves alleged that he was disabled beginning on April 5, 1995.

from April 8, 1995 to February 1, 1999, to this court.

On July 28, 2006, on another motion to remand by the Commissioner, the court again remanded this case pursuant to sentence four of 42 U.S.C. § 405(g) for consideration of the effects of Reeves's diabetes on his ability to work. (R. 864-67 & 872-73). On remand from the court, the Appeals Council directed a different ALJ to

> specifically make a determination at step two of the sequential evaluation with respect to [Reeves's] diabetes. The Administrative Law Judge will also specifically consider any limitations resulting from [Reeves's] diabetes, and consider this impairment in combination with [Reeves's] other impairments.

(R. 873-74).

Following a third administrative hearing before a different ALJ, the ALJ concluded that, between April 8, 1995 and February 1, 1999, Reeves had the following severe impairments: "drug and alcohol abuse, spondylolisthesis, gastroesophageal reflux disease with acute episodes of pancreatitis, diabetes mellitus with poor medical compliance, and major depressive disorder with psychosis." (R. 834). The ALJ further concluded that Reeves could not perform his past relevant work as an iron worker. (R. 849-50). Nonetheless, the ALJ concluded that Reeves was not disabled because "when the effects of alcohol and drug abuse are factored out for the period between April 8, 1995, to February 1, 1999, [he] was capable of making a successful adjustment to other work in that exists in significant numbers in the national economy." (R. 851). Reeves appealed the ALJ's decision to the Appeals Council, requesting the Appeals Council review the ALJ's decision. The Appeals Council rejected the request for reconsideration, and the ALJ's decision consequently became the

final decision of the Commissioner.

The case is now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1631(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded for an award of benefits.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3)  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?

---

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

5

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

### III.  Procedural History

### A.  Introduction

Reeves was 41 years old at the time of onset and 54 years old at the time of the third

decision of the ALJ.  (R. 850-51).  He completed the eighth grade and can read, write and do

simple mathematics.  (R. 34).  Reeves's prior experience includes work as an iron worker,

welder and kitchen worker.  (R. 61).

### B.  Plaintiff's Claims

As stated by Reeves, he presents the following two issues for the Court's review:

I.      Whether the Commissioner's ALJs applied improper legal
        standards in concluding that Mr. Reeves did not meet Listing
        12.04 before February 1999.

II.     Whether the ALJ improperly failed to give controlling weight to
        the opinion evidence of Mr. Reeves' treating physician.

(Pl's Mem. Br., doc. # 11, at 8).

### IV.  Discussion

The court conducts a *de novo* review of the Commissioner's legal conclusions.  *See*

*Lewis v. Barnhart,* 285 F.3d 1329, 1330 (11th Cir. 2002).  "Further, on review, there is no

presumption "that the Commissioner followed the appropriate legal standards in deciding a

claim for benefits or that legal conclusions reached were valid. Instead, we conduct an

exacting examination of these factors.""  *Davis v. Astrue,* 287 Fed. Appx. 748, 752 (11th Cir.

2008) *quoting  Miles v. Chater,* 84 F.3d 1397, 1400 (11th Cir.1996).

### A.  Relevant Medical Treatment during the time period at issue

On July 22, 1994, Reeves was admitted to the Veterans Administration ("VA") hospital for drug and alcohol treatment.  He was diagnosed with "drug dependence, crack cocaine, continuous" use, "alcohol dependence, continuous" use, and "chronic low back pain." (R. 183).  He was discharged on September 2, 1994. (*Id.*).  At that time, a treatment note indicated that Reeves was "employable[, but to a]void back strain." (R. 184).

Reeves was admitted to the VA hospital again on April 8, 1995. (R. 185).  He was diagnosed with "Dythymia, Alcohol dependence, Crack cocaine dependence, Personality disorder, Chronic back pain bilateral S1 radiculopathy." (*Id.*)  His conditions were severe and his GAF score was 50.[5] (*Id.*).  He was prescribed Feldene for back pain, Zoloft[6] for depression, and Trazodone[7] for depression and insomnia. (R. 185).  Reeves was discharged from the VA on May 10, 1995. (*Id.*).  At that time, his depression was responding to medication, and his condition was stabilized. (R. 186-87).  "[D]epression gradually improved with a combination of chemotherapy, hospital milieu and abstinence from substance abuse." (*Id.*)

Between 1995 and 1998, while living in Tennessee, Reeves received treatment for

---

[5]  The Global Assessment Functioning Scale considers the psychological, social, and occupational functioning of an individual suffering from mental illness.  A score of between 41 and 50 indicates serious symptoms or serious impairments in social, occupational, or school functioning.  *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994).

[6]  Zoloft is an antidepressant used to treat major depressive disorder in adults.

[7]  Trazodone is an antidepressant used to treat major depressive episodes.

depression for two years.[8]  (R. 253).  Reeves was hospitalized again on January 27, 1998 for "Major depression, recurrent" and "Dysthymic disorder."  (R. 191).   At that time, it was noted that he had a "history of polysubstance abuse."  (*Id*.)   On admission, Reeves acknowledged that he had stopped taking his anti-depressant medication.  (*Id*.).  He was depressed, his motor skills were slow, and his affect "was flat, somewhat tearful and depressed. . . . His insight and judgment were impaired"  (R. 191-92).  Although Reeves stated that he last used cocaine and marijuana a month before his admission, his major problem was depression.  (R. 254, 256).  Reeves admitted that he used cocaine "to get relief from the depression."  (R. 247).  Reeves denied alcohol use.  (R. 252).  A urinalysis test for drugs was negative.  (R. 192).

His initial diagnoses included "major depression, alcohol abuse, in present remission, and cocaine abuse, last [use] 1 mo[nth] ago."  (R. 247).  A treatment note indicates "[h]istory of long term treatment for depression and one suicide attempt by overdose of medication."  (R. 251).  At the time of his admission, Reeves's GAF score was between 41 and 50.  (R. 249).  He was experiencing severe psychiatric stressors including chronic pain, unsafe living conditions and unemployment.  (*Id*.).  His dominant complaints were depression, back pain, and insomnia.  (*Id*.).  He was diagnosed with major depression "with preoccupation with somatic problems."  (R. 246).  Reeves was prescribed Trazodone and Zoloft.  (R. 247).

Reeves remained hospitalized and received treatment until March 18, 1998.  (R. 257).

_____

[8]  These records were not included in the 1328-page record provided to the court.

9

During treatment, it was noted that Reeves was attempting to mask his depression.  (R. 239).

After a week of treatment on anti-depressants, psychological testing revealed the following.

> The veteran was administered the Minnesota Multiphasic Personality Inventory–II, the Million Clinical Multiaxial Inventory-II, the Beck Depression Inventory, the Beck Anxiety Scale, and the Beck Hopelessness Scale.  Results of the MMPI-2 indicate that the veteran endorsed items in an extremely defensive fashion.  We refer to this attempt to look better off psychologically than is in fact the case "faking good."  The results of the clinical scales indicate a person who is likely to present with somatic complaints.  Rather than being grossly incapacitated in functioning he is likely to continue functioning but at a reduced level of efficiency.  He may make excessive use of denial, projection, and rationalization, and blame others for his difficulties.  He is likely to prefer medical explanations for his symptoms and lack insight into psychological factors underlying his symptoms.  He may have a strong need for attention, affection, and sympathy.  Social relationships are likely to be shallow and superficial.  A compliant attitude towards authority and a tendency to be controlling with everyone else is likely.  He tends to keep his emotions in check.  Beck scores indicate mild to moderate levels of anxiety and depression and hopelessness scale score falls within the normal range.  Psychosis is not supported by this assessment.

(R. 233).

Reeves was assigned to work in the Print Clinic on February 11, 1998.[9]  (R. 216).  He began work on February 18, 1998.  (*Id*.).  On February 19, 1998, Reeves formally sought admission to the VA's supported employment program.  (R. 223-24).  On February 20, 1998, the doctors refused medical clearance.  (R. 224).

> Received results of the EMG from Dr. Umakantha.  His comments indicate that vet may be in a work setting as tolerated except prolonged standing, no bending or stooping, no prolonged sitting and may need rest breaks to stand and stretch.

---

[9]  The record does not disclose why Reeves was assigned work before he was approved to do that work.

> Discussed the above with Dr. Kitchner and feel that considering these medical precautions, that it is not advisable to accept Mr. Reeves in the supported employment program since the treatment activities that are available have the physical requirements which Dr. Umakantha advises against. If Mr. Reeve's (sic) medical problems can be resolved, reconsideration will be given to accepting him into the supported employment program.

(R. 224).

Reeves was discharged from the Print Clinic on March 11, 1998 due to his physical inability to handle the work. (*Id.*).

On March 5, 1998, Reeves was screened and admitted into the VA's thirty day Genesis Day Program.[10] (R. 220-21). Reeves began the Genesis program on March 10, 1998. (R. 218). On March 13, 1998, Reeves took the Beck Depression Inventory again. (R. 212). His score was "indicative of moderate depressive symptoms," notwithstanding his two months of in-patient psychiatric treatment. (*Id.*) "The results indicate that [Reeves] is reporting moderate emotional distress or depression with recent thoughts of suicide. However, he denies current thoughts of self-harm." (*Id.*).

On March 16, 1998, Reeves reported continued depression. (R. 210). By March 23, 1998, the staff was reporting Reeves as being manipulative "to gain attention and medications." (R. 198). On March 24, 1998, although Reeves "[wa]s not looking forward to discharge and desire[d] to remain hospitalized," he met with his treatment team to discuss his discharge. (R. 195-96). He was reminded of his need to be compliant with medication,

---

[10] The Genesis Day Program appears to be an intensive community based care psychiatric day program to help veterans integrate into the community.

and to attend his follow up appointments.  (R. 195).  It was noted that "he will require much redirection and frequent reminders as to why he can no longer do things "his own way."  (*Id*.)  Reeves was discharged on March 25, 1998.  (R. 193).  His medications at the time of discharge included Glipizide,[11] Diphenhydramine Hydrochloride,[12] Propantheline,[13] Chlorzoxazone,[14] Levothyroxine,[15] and Motrin.  (*Id*.).  Although Reeves was treated with Trazadone and Zoloft while hospitalized and warned to continue compliance with his medication regime, astoundingly he was not prescribed anti-depressant medication when he was discharged.[16]  (*Id*.; R. 288-89).

Not surprisingly, Reeves was admitted to the VA hospital on July 7, 1998 with "[r]ecurrent depression with suicidal ideas."  (R. 258).  At that time, he complained that he could not "live with the pain and depression."  (*Id*.).  His mood and affect were depressed and his insight and judgment were impaired.  (*Id*.).  He denied "abusing any alcohol."  (*Id*.)  His GAF was 40.  (*Id*.).  Although his drug screen on admission was positive for benzos, (R. 259), it was noted that "[h]e commendably has not resumed the abuse of alcohol or other mood-altering substances."  (R. 288). His polysubstance abuse was in remission.  (R. 284).

---

[11]  Glipizide is a medication used to treat diabetes.

[12]  Diphenhydramine is the generic name for Benadryl and is used to treat allergies.

[13]  Propantheline is a medication used to treat ulcers.

[14]  Chlorzoxazone is a muscle relaxant.

[15]  Levothyroxine is a replacement thyroid hormone used to treat hypothyroidism.

[16]  On his second admission to the VA, the staff apparently realized their error of discharging him without medication because Reeves's medications were promptly restarted.  (R. 259).

On July 16, 1998, during a psychological evaluation, Reeves took the MMPI-II, MCMI-II, Beck Depression Scale, Beck Anxiety Index, State-Trait Anxiety Inventory and the Beck Hopelessness Scale.  (R. 266).

Mr. Reeves has a long history of drug abuse.  He reportedly used drugs in the service and began using cocaine in 1982.  He started smoking crack cocaine at least 5 years ago and says that cocaine is his "drug of choice" but that he will use anything that he can get his hands on.  According to the patient, he completed the substance abuse program at the Tuscaloosa VAMC twice with his most recent treatment here in 1994.  He claims that he has been mostly free of drugs and alcohol for 9 months, but he admitted to one episode of drug use and one period of alcohol abuse.

Mr. Reeves was also hospitalized at the Tuscaloosa VAMC in 5/95 and 3/98 on acute psychiatry for complaints of depression.  He has had psychiatric diagnoses of dysthymic disorder and major depression as well as personality disorder, NOS.  The patient reports a suicide attempt by overdose about 10 years ago.

Mr. Reeves said that he was a steel worker when he hurt his back about 8 years ago, and he has subsequently been employed in a fabrication shop.  His last attempt at working was 6 months ago.[17]  In addition to back problems, Mr. Reeves has diabetes and diverticulosis.

*       *       *

Mr. Reeves seemed manipulative and evasive in interview, but he was not hostile or unfriendly.  He did not appear depressed or anxious, and affect was appropriately animated.  There was no evidence of delusional or disordered thinking, and the patient did not spontaneously report feelings of paranoia or undue suspiciousness.

Test results were of limited validity because of a strong tendency to overstate his symptoms.  Responses to the Minnesota Multiphasic Personality Inventory-2 were indicative of very high levels of emotional distress and somatic preoccupation, and the patient reported very severe psychotic symptoms.  Mr.

---

[17]  This time would correspond to his attempt to work in the VA print shop while hospitalized for depression.

Reeves endorsed 32 out of 33 items on the Depression content scale and 22 of 23 items on the Anxiety content scale. He also endorsed a large proportion of items on the Hypochondriasis, Paranoia, and Schizophrenia scales. He reported ideas of reference and feelings of persecution, and he described himself as an extremely hostile, angry, and immature person with very severe family problems.

Axis II symptoms on the Million Clinical Multiaxial Inventory-II were less over-reported, so that the results were not technically invalid. The patient described himself as an emotionally unstable person who is impulsive and self-destructive, and who is prone to chronic emotional distress with possible suicidal or self-injurious behaviors. He is likely to be irresponsible, shallow, and very self-centered. The patient may also be manipulative and immature with little capacity for empathy.

Very high levels of emotional distress were reported on the Beck scales. Mr. Reeves endorsed all 20 items on the Beck Hopelessness Scale, which would indicate severe hopelessness and despondency if test results were valid. He also endorsed severe depression on the Beck Depression Scale and severe anxiety on the Beck Anxiety Inventory. He indicated that he would like to kill himself on the Beck Depression Scale.

*        *        *

Conclusions & Recommendations

*The results of this assessment suggest symptom exaggeration in a patient with severe personality problems. Antisocial, passive-aggressive, and possible borderline personality characteristics are suggested.* The patient has a long-standing drug and alcohol addiction, although he reports some degree of sobriety during the last 9 months. There is also a significant problem with chronic pain, which may be exacerbated by substance abuse, and the patient has been diagnosed with major depression in the past. The extent to which pain is disabling and the current degree of emotional distress are difficult to evaluate because of symptom exaggeration. The patient does not seem very depressed at present, and he did not appear to be in constant pain, though it is quite possible that his back injury and pain may prevent him from performing many types of activities. *Anger may be a serious problem for the patient. There appear to be numerous stressors in the life of the patient, including family problems and vocational limitations, and he appears to be immature*

14

*and self-centered and to have very poor coping skills. Although there may be*
*minimal distress when hospitalized, emotional disturbances may become much*
*more evident when he returns home to his old problems.* Consequently,
regular outpatient counseling following discharge might be beneficial. The
patient does not appear to be suicidal at the present time, but under stress and
the influence of alcohol or drugs, there is the potential for self-destructive
gestures or attempts.

(R. 264-65) (emphasis and footnote added).

Reeves was discharged on July 16, 1998 with the following medications:

Propoxyphene/APAP,[18] Daypro,[19] Griseofulvin,[20] Glipizide, Metformin,[21] Paroxetine,[22]

Desyrel,[23] and Dimetapp.[24]  (R. 259-60).

Reeves was admitted to the VA hospital again on February 9, 1999. At that time, he

was diagnosed with "[m]ajor depression, recurrent, moderate," diabetes, and lumbar

spondylolysis. (R. 326). His GAF score was 50. There was no indication of drug or alcohol

abuse, and he denied any drug or alcohol use for a year. (R. 353). His "mood was dysthymic

and affect was flat and depressed." (R. 326). Reeves remained hospitalized until February

17, 1999. (R. 326-54).

---

[18]  Propoxyphene/APAP is a narcotic analgesic used to treat chronic pain.

[19]  Daypro is an anti-inflammatory medication used to treat chronic pain.

[20]  Griseofulvin is an antibiotic used to treat different fungi.

[21]  Metformin is a medication used to treat diabetes.

[22]  Paroxetine is the generic name for the medication Paxil and is used to treat depression.

[23]  Desyrel is the brand name for the medication Trazodone and is also used to treat depression.

[24]  Dimetapp is used to treat allergies and sinus congestion.

### B.  Drug and Alcoholism

Reeves attempts to challenge adverse findings in all three determinations for the closed period at issue.  However, the only findings properly before the court are those made by the ALJ in the third decision rendered on April 15, 2008.  The court must determine whether the ALJ applied the proper legal standards and whether his determination is supported by substantial evidence.  The crux of Reeves's arguments is that the ALJ misapplied the law when he concluded that Reeves did not meet or equal Listing 12.04 before February 1999.

The ALJ concluded that Reeves was not disabled during the period between April 8, 1995 and February 1, 1999.  (R. 832).  The ALJ determined that "the occupational base was so severely eroded during the period at issue that [Reeves] was unable to perform other jobs existing in significant numbers in the national economy when engaged in alcohol and drug abuse."  (R. 850).  Nonetheless, relying on the testimony of a medical expert, the ALJ concluded that "[w]hen the effects of polysubstance abuse are disregarded, [Reeves'] mental impairments considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 or 12.09."  (R. 844-45).  For the reasons that follow, the court concludes that the ALJ did not apply the appropriate legal standards, and that his determination is not supported by substantial evidence.

Listing 12.04 deals with affective disorders and depressive syndromes.  Listing 12.09 deals with substance and addiction disorders.  Listing 12.08 deals with personality disorders.

16

In the initial disability determination, the ALJ found that Reeves was disabled since February 1, 1999.

> Since February 1, 1999, the evidence demonstrates that the claimant has been drug and alcohol free; however, the evidence further demonstrates that since that time, the claimant has had a severe impairment at Listing level. However, I am persuaded by the record and testimony, that subsequent to February 1, 1999, the claimant has remained symptomatic of mental impairments (non-alcohol and non-drug related) which are attended with findings that meet the criteria of § 12.04 of the Listing of Impairments set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. To be met Medical Listing 12.04 requires an affective disorder characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. In this case, the claimant has a depressive syndrome. This syndrome must be characterized by at least four of certain enumerated features. In this case the enumerated features which meet this requirement are anhedonia or pervasive loss of interest in activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, difficulty concentrating or thinking, thoughts of suicide, and hallucinations, delusions or paranoid thinking. These features result in marked difficulties in maintaining social functioning and deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner. I conclude, therefor, that since February 1, 1999, the claimant's impairment is attended with the same findings as Medical Listing 12.04, 20 CFR Part 404, Appendix 1 to Subpart P.

(R. 23-24). The ALJ's finding rests on the fact that Reeves had a negative drug test in February 1999. (R. 19).

In the determination before the court, the ALJ concluded that Reeves did not meet the Listing 12.04, Affective Disorders, or 12.09, Substance Addiction Disorders, during the applicable time period because of his on-going polysubstance abuse. (R. 843). The ALJ did not consider whether Reeves met Listing 12.08, Personality Disorders despite the fact that he had been diagnosed as suffering from a personality disorder. (R. 185, 264, 300, 355, 378).

A review of the medical records demonstrates that the ALJ culled the record for selective entries and ignored evidence that did not support his conclusions.  For example, the ALJ does not consider any of Reeves's testimony regarding his depression prior to February 1, 1999 because of his "alcohol/drug dependence and abuse."  (R. 848).  The ALJ refers to Reeves's 1998 stint in a drug rehabilitation program.  (*Id*.).  However, Reeves was not hospitalized in 1998 for drug treatment.  Reeves was hospitalized on July 22, 1994 for detoxification and drug treatment, which was the last drug rehabilitation program he completed. (R. 183, 901).

Although Reeves confessed to using crack cocaine and alcohol when he was hospitalized in April 1995, he was admitted for treatment of depression, not drug addiction. (R. 185).  Reeves remained hospitalized for treatment of his depression until May 10, 1995. (*Id*.).  Reeves was hospitalized again on January 27, 1998 for major depression and dysthymic disorder.  (R. 191).  While he had a 'history' of polysubstance abuse, his drug screen was negative.  (R. 192).  He remained hospitalized until March 18, 1998 when he was transferred into the Genesis Intensive Day Program.  (R. 257, 220-21).

Reeves was hospitalized again on July 7, 1998 with "[r]ecurrent depression and suicidal ideas."  (R. 258).  It was noted that his polysubstance abuse was in remission.  (R. 284).  Reeves remained hospitalized until July 16, 1998.  At that time, a psychological assessment noted that Reeves had some "severe personality problems," including "[a]ntisocial, passive-aggressive, and possible borderline personality characteristics."  (R. 264-65).  The assessment indicated that Reeves was "immature and self-centered," and had

"very poor coping skills." (*Id*.).  Anger was also an issue for him.  (*Id*.).  "Although there may be minimal distress when hospitalized, emotional disturbances may become much more evident he returns home to his old problems."  (*Id*.).

Reeves was hospitalized at least two more times for treatment of his depression in February 1999 and June 1999.  Consequently, Reeves's hospitalizations were for treatment of his recurrent major depression and not for on-going substance abuse.  Moreover, the ALJ relied on Reeves's negative drug test in February 1999 to conclude that he was no longer using drugs.  The court notes that Reeves had a negative drug screen  in January 1998, (R. 192), March 1998 (R. 896-97) and February 1999.  (R. 892).

The ALJ is not free to simply ignore medical evidence, nor may he pick and choose between the records selecting those portions which support his ultimate conclusion.  The ALJ's failure to mention or consider contrary medical records, let alone articulate reasons for disregarding them, is reversible error.  *Broughton v. Heckler,* 776 F.2d 960, 961 (11th Cir. 1985).

The ALJ compounds his error by relying on the testimony of the medical expert, Sydney H. Garner.  Dr. Garner testified that Reeves only had two mental impairments during the time period at issue – major depressive disorder with psychosis and "an ongoing polysubstance abuse diagnosis."  (R. 1308-09).  The medical expert testified that the *only other mental limitation Reeves had during this period was major depression.* (R. 1311).  The medical expert is simply wrong.  First, contrary to Dr. Garner's assertion, Reeves was not

diagnosed with or treated for ongoing polysubstance abuse during the applicable time period. It is undisputed that Reeves had a history of polysubstance abuse. However, the evidence does not support the finding that Reeves's substance abuse continued unabated from 1995 until February 1, 1999.

The ALJ also relied on the medical expert's testimony that Reeves's "major depressive disorder was less severe after February 1999. His depression would not meet or medically equal section 12.04 of the listing of impairments." (R. 843). This conclusion makes no sense in light of the fact that Reeves was found disabled on February 1, 1999, *because* he met Listing 12.04. (R. 24). Moreover, during the relevant period, Reeves was also diagnosed with a personality disorder (R. 185, 264-65). The medical expert clearly did not consider the effects of Reeves's personality disorder, either singly or in combination, with Reeves' other mental impairments. Thus, the ALJ erred as a matter of law when he relied on Dr. Garner's flawed testimony.

Throughout the ALJ's opinion, he relies on selective recitation of the evidence, referring only to those records which support his decision. For example, the ALJ points to VA records that Reeves "was considered employable." (R. 848). While the records indicate that Reeves was considered employable in 1994,[25] the ALJ ignores evidence that Reeves was considered *unemployable* in 1998. On February 20, 1998, the VA doctors refused medical

---

[25] The ALJ relies on a single treatment note on Reeves's discharge summary in May 1995 that Reeves was "able to work." (R. 186). The ALJ overemphasizes the importance of this note. There is no further explanation of the notation, and no way to tell who made the note. Without more, the ALJ's reliance on the single notation is misplaced.

clearance to Reeves to participate in the VA's own supported employment program. (R. 224). Thus, the mere fact that Reeves may have been employable in 1994 does not translate into an ability to work in 1998, particularly considering that he was denied permission to work in the VA's own work program.

Additionally, although the ALJ refers to Reeves's GAF scores, he does not consider the relevance of these scores. A GAF score of between 41 and 50 indicates serious symptoms or serious impairments in social, occupational, or school functioning. *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994). A rating of 31-40 indicates "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Haag v. Barnhart*, 333 F.Supp.2d 1210, 1214 (N.D. Ala. 2004) (*quoting* DSM-IV-TR at 34). A GAF of 35 is strong evidence of an inability to work. *Haag*, *supra* (*citing Lloyd v. Barnhart*, 7 F.Appx. 135, 2002 WL 31111988 at *1, n. 2 (3rd Cir. 2002)).

On April 8, 1995, Reeves was admitted to the VA hospital with a GAF score of 50. (R. 185). When he was admitted to the hospital in January 1998, his GAF score was between 41 and 50. (R. 249). In July 1998, Reeves's GAF score was 40. (R. 258). When Reeves was hospitalized in February 1999, his GAF score was 50. (R. 326). Interestingly, Reeves's GAF score in February 1999 was higher than his scores during the time period at issue. While the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct

correlation to the severity requirements of the mental disorders listings," *See* 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000), the scores emphasize the inherent contradictions in the ALJ's determination. Reeves's recurrent major depression and dysthymia were worse prior to February 1, 1999. Even the medical expert testified that Reeves's depression decreased in severity after February 1, 1999, the date he was deemed disabled due to his depression. (R. 1311-12). It follows that if, on February 1, 1999, Reeves met the Listing 12.04 for depression, and his condition was more severe prior to that date, then he must have also met Listing 12.04 before February 1, 1999. Inexplicably, the ALJ concluded that Reeves did not meet Listing 12.04 prior to February 1999.

The ALJ concluded that "[w]hen the effects of alcohol and drug abuse are factored out for the period between April 8, 1995, to February 1, 1999, [Reeves] was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 851). However, the ALJ failed to properly apply the law when he did not follow the sequential analysis before considering whether the plaintiff's drug addiction was a contributing factor to the disability determination. *See Doughty v. Apfel*, 245 F.3d 1274, 1279 (11th Cir. 2001); *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001). The governing regulations require the Commissioner to *first* determine whether the plaintiff is disabled *before* considering whether his drug addiction or alcoholism is a contributing factor material to disability. *See* 20 C.F.R. § 404.1535. *See also POMS Section DI* 90070.050B1 ("Follow

the general disability case development and evaluation process . . . to decide whether the

individual is disabled.")

> The implementing regulations make clear that a finding of disability is a
> condition precedent to an application of § 423(d)(2)(C). 20 C.F.R. §
> 416.935(a). The Commissioner must *first make a determination that the
> claimant is disabled. Id*.

*Drapeau*, 255 F.3d at 1215 (emphasis added).

> *If a claimant is disabled*, but has evidence of drug addiction or alcoholism, the
> ALJ must determine whether the drug addiction or alcoholism is a contributing
> factor material to the determination of the finding of disability. 20 C.F.R. §
> 404.1535(a). *In making this determination, the ALJ considers whether the
> claimant is disabled without the drug addiction or alcoholism*. 20 C.F.R.
> 404.1535(b)(1). *The ALJ considers which of the disabling conditions would
> remain should the claimant stop using drugs or alcohol*. 20 C.F.R. §
> 404.1535(b)(2). If the ALJ determines that the claimant's remaining
> limitations would not be disabling, the ALJ will find that the drug usage or
> alcoholism is a contributing factor material to the determination of disability.
> 20 C.F.R. § 404.1535(b)(2)(i). Drugs and alcohol are a contributing factor
> material to the determination of disability when they form *the exclusive basis*
> for the finding of disability. *If there are other grounds for finding the claimant
> disabled, then drugs and alcohol are not a contributing factor material to the
> determination of disability*. 20 C.F.R. § 404.1535(b)(2)(ii).

*Englert v. Apfel*, Case No. 97-1526-CIV-ORL-18C, 1999 WL 1289472, at *8, n.3 (M.D. Fla.

June 16, 1999) (emphasis added). *See also, Deters v. Commissioner of Social Sec*., 301

Fed.Appx. 886, *1 (11th Cir. 2008).

Only after the ALJ concludes that the plaintiff is disabled, should the ALJ consider

whether the plaintiff's drug addiction is a contributing factor material to the disability

determination. In this case, the ALJ focused on Reeves's polysubstance abuse to discredit

him, and improperly conflated the disability finding with the materiality finding. At no point

did the ALJ determine whether Reeves was disabled without consideration of his drug addiction. Because the ALJ did not consider whether Reeves was first disabled, his finding that Reeves's polysubstance abuse was a contributing factor material to disability is simply wrong. Consequently, the court concludes that the ALJ improperly interjected Reeves's drug addiction into the sequential analysis. Thus, the ALJ failed to properly apply the law, and his finding that Reeves was not disabled before February 1, 1999 because of his drug abuse is not supported by substantial evidence.

Moreover, if the ALJ had properly applied the law and conducted the appropriate analysis, Reeves would have perforce been found disabled under Section 12.04 of the Listing of Impairments during the applicable time period. *See* 20 C.F.R. Subpart P, Appendix 1. The Listing provides, in pertinent part, that a claimant is disabled if he meets the following criteria:

> § 12.04. *Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements of C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or

24

d.  Psychomotor agitation or retardation; or
e.  Decreased energy; or
f.  Feelings of guilt or worthlessness; or
g.  Difficulty concentrating or thinking; or
h.  Thoughts of suicide; or
i.  Hallucinations, delusions, or paranoid thinking; . . .

*     *     *

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1.   Repeated episodes of decompensation, each of extended duration; . . .

Section 12.04 of the Listing of Impairments, 20 C.F.R. Subpart P, App. 1.

In December 2000, the ALJ found, and the Appeals Council accepted, that, beginning February 1, 1999, Reeves met Listing 12.04 due to his depressive syndrome.  (R. 24).  There is no indication in the medical records that Reeves's depression and dysthymia were better between April 8, 1995 and February 1, 1999.  In fact, the medical records support a conclusion that his depression was worse between those times.  Reeves was first hospitalized on April 8, 1995, for severe depression.  (R. 185-86).  He was anxious, depressed and experiencing ruminating thoughts.  (R. 187-88).  He was prescribed Zoloft and discharged on May 10, 1995.  (R. 187).  Reeves received treatment for his depression for two years when he lived in Tennessee.

On January 27, 1998, Reeves was hospitalized again for recurrent major depression.

(R. 191).  He was experiencing insomnia, (R. 249), and he was preoccupied with his somatic problems.  (R. 246).  Reeves remained hospitalized until March 25, 1998 when he was discharged into the Genesis Day Program, an intensive community care psychiatric program. (R. 293).  On July 7, 1998, Reeves was hospitalized for recurrent depression with suicidal thoughts.   His judgment was impaired, and he was experiencing sleeplessness and hopelessness.  (R. 298).  He remained hospitalized until July 16, 1999.

The medical records demonstrate that Reeves has suffered from major depression since at least April 1995.  During his numerous hospitalizations, he has reported episodes of anhedonia, insomnia, suicidal thoughts, difficulty concentrating, decreased energy, and feelings of hopelessness and anxiety.  His depression spans the time period at issue – from April 1995 until February 1, 1999.   He experienced at least three episodes of decompensation, requiring extended hospital stays.  Consequently, Reeves was disabled.

Following the appropriate sequential analysis, the ALJ would then have considered whether Reeves remained disabled if he stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(2). In 2000, the ALJ concluded that Reeves's depression was disabling even after he stopped using drugs and alcohol.  (R. 24).  "Since February 1, 1999, the evidence demonstrates that [Reeves] has been drug and alcohol free; however, the evidence further demonstrates that since that time, [Reeves] has had a severe mental impairment at Listing level."  (R. 23).  Consequently, as a matter of law, the ALJ found that Reeves's drug addiction was not a contributing factor material to the disability determination.  "The key

26

factor . . . in determining whether drug addiction . . . is a contributing factor material to the determination . . . is whether we would still find you disabled if you stopped using drugs . . ." 20 C.F.R. § 404.1535(b)(1). Because the ALJ determined that Reeves's depression was disabling *independent* of drug or alcohol addiction, his polysubstance abuse could not be a contributing factor material to the disability determination. 20 C.F.R. § 404.1535(b)(2)(ii). Because Reeves meets the requirements of Listing 12.04, and his polysubstance abuse was not a contributing factor material to his disability, Reeves should have been found disabled as a matter of law. *See McDaniel*, 800 F.2d at 1026 ("An affirmative answer . . . leads . . .to . . . on step three . . . a finding of disability.")

In reaching this conclusion, the court has carefully considered whether it should remand this case to the Commissioner for further proceedings, or reverse and remand for an award of benefits. Reeves originally filed his application for disability benefits in 1999. (R. 831). The ALJ's final determination was issued on April 15, 2008. (R. 852). As noted earlier in this opinion, this is the third time this case has come to this court. While Social Security proceedings are inquisitorial, not adversarial, *see Ingram v. Commissioner of Social Sec. Admin.*, 496 F.3d 1253 (11th Cir. 2007), courts have long, routinely assigned evidentiary burdens to both the claimant and the Commissioner. *See, e.g., Johns v. Bowen*, 821 F.2d 551 (11th Cir. 1987) (A Social Security claimant bears the initial burden of proving inability to perform prior relevant work); *Jackson v. Bowen*, 801 F.2d 1291 (11th Cir. 1986) (If a claimant meets the burden of showing he can no longer do his past relevant work, the burden

shifts to the Commissioner to prove that other work exists in the national economy which the claimant can perform).  Reeves has met his burden of demonstrating that he meets Listing 12.04 and that he is disabled.  The Commissioner has failed, three times, to properly apply the law, and the court concludes that he shouldn't get another chance to get it right.  Enough is enough.

Accordingly, the court concludes that it is appropriate to reverse the decision of the Commissioner so that benefits may be awarded to the plaintiff.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (reversal with award of benefits appropriate where the Commissioner has already considered the essential evidence and it is clear that the evidence establishes disability without any doubt).  *See also Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988) ( failure to apply the correct legal standards is grounds for reversal and an award of benefits).

## V.  Conclusion

Accordingly, the decision of the Commissioner will be reversed and the case remanded to the Commissioner with instructions that benefits be awarded to the plaintiff.

A separate order will issue.

Done this 31st day of March, 2010.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

28